**Janice M. CARTER, Appellant,**

v.

**Charles M. CARTER, Respondent.**

**No. WD 47833.**

Missouri Court of Appeals,
Western District.

Feb. 1, 1994.

Allen S. Russell, Kansas City, for appellant.

Thomas K. Thompson, Liberty, for respondent.

Before LOWENSTEIN, P.J., and TURNAGE and FENNER, JJ.

FENNER, Judge.

In this dissolution of marriage action, appellant, Janice M. Carter (Wife), appeals the Decree of Dissolution entered by the Circuit Court of Clay County, Missouri, with respect to the court's division of property and maintenance award. Custody, visitation, and child support are not at issue in this appeal.[1]

Appellant and respondent, Charles M. Carter (Husband), were married on October 16, 1982, and separated on August 18, 1991. Two children were born of the marriage: Lukas Michael Carter, born July 7, 1986, and Lauren Elizabeth Carter, born November 2, 1987.

Wife filed her petition for dissolution on August 26, 1991. A hearing took place on October 28th and 29th of 1992. The record reflects that the parties reached an agreement as to how to allocate the property and debt between them, and wanted to put this matter on the record at the hearing. At the beginning of the hearing, it was agreed that "Counsel could recite the property into the record and just get a confirmation that the parties agree." After testimony by Wife and Husband as to the agreements reached on custody, visitation and child support, Wife's attorney recited the parties' understanding as to the division of assets. In doing so, he referred to Wife's Exhibit Number 2 (Exhibit 2), which is a summary of assets. Wife's attorney noted that Exhibit 2 has numerous "markups and cross-outs and changes, but ... counsel are in agreement with respect to the adjustments that get down to, ... the proverbial bottom line." Wife's counsel proceeded to recite the agreement between the parties, which was as follows:

1. On page 2 of Exhibit 2, there were certain retirement assets, CD's, and sav-

---

1. The parties settled the issues of custody, visitation, and child support. A written stipulation as to custody, visitation, and counselling was signed by both parties and was filed with the court on October 29, 1992. Appellant retained custody of the children, and the parties agreed that respondent would pay $600 per month in child support.

ings bonds listed. The parties agreed that the handwritten numerals on that page accurately set forth the valuation of these assets. No oral record was made as to the specific assets or their values other than a general reference to Exhibit 2.

2. The proceeds from the sale of the marital residence, which are held in a money market account, are to go toward satisfying the guardian ad litem fees. Any remaining proceeds are to be split 50/50 between the parties.

3. As to the vehicles, Wife retains the Ford Bronco. Husband retains the Ford Taurus having a net value of $1000 (not reflected on the schedule). Husband retains the CJ–5 Jeep.

4. Schedule A sets forth the extent of Wife's non-marital assets.

5. Schedule B sets forth the extent of Husband's non-marital assets.

6. Schedule C sets forth the extent of Wife's marital personal property and household goods. On Schedule C, there are two typewritten columns representing each party's valuation of the particular item of property. Between the typewritten columns, there is a handwritten column which indicates the compromised values attributable to each of these items of property.

7. Schedule D sets forth the extent of Husband's marital property. However, certain instruments listed on Schedule D are to be awarded to Wife. If the handwritten numerals are on the left side of the two typewritten columns, those assets are to be awarded to Wife. If the handwritten numerals are listed in between the two typewritten columns, those assets are to be awarded to Husband.

8. Wife has net personal property of approximately $7,947. Husband has net personal property of approximately $8,215.

9. Some "minor adjustments" have been agreed to, and this is reflected in the cash payout to Wife.

10. In addition to IRA's, CD's, personal property, and vehicle, Wife has total property worth approximately $45,489. Husband has total property worth approximately $69,841 ($51,508 after certain debt obligations).

11. To equalize division of property and to satisfy retroactive child support, Husband will pay Wife $10,000. This amount represents (1) compensation for some expenses relating to residence after both parties have moved out; (2) $1,378 in insurance proceeds that Husband received and for which Wife had paid underlying medical expenses; (3) approximately $3,000 (because difference in values of underlying assets the parties were to have received was approximately $6,000); and (4) $4,772 in retroactive child support.

12. To pay the $10,000, Husband has until April 30, 1993, to take out loan against one of his 401(k) plans at Trans World Airlines, Inc. (TWA). The $10,000 sum shall not begin to bear interest until January 31, 1993, but shall bear interest after said date at 9% rate.

13. If by April 30, 1993, Husband is unable to effectuate loan from 401(k), then a Qualified Domestic Relations Order (QDRO) will be drafted and submitted to the court which would divide one of the assets in an amount which would compensate Wife for the $10,000 plus accrued interest.

14. There is one other retirement plan— non-marital portion attributable to some of that, but marital portion will be divided pursuant to QDRO which will be submitted to court.

15. Husband has scheduled and specified certain debt obligations that he has agreed to assume.

Counsel for both parties agreed that the above list represents the entirety of the agreement, and is a full and complete distribution of the parties' assets and liabilities. Exhibit 2 was admitted into evidence.

The court acknowledged that the parties "stipulate[d] to child custody, visitation and support, and to the division of property." Counsel for husband asked the judge, "Your Honor, do you want the parties to be put on the stand as to verifying the division of property?" The court responded, "No, I have the stipulation of counsel. It's not necessary." The court then proceeded, on October 29,

1992, to consider the contested issues of attorney's fees, court costs, and maintenance.

At some point, a proposed Decree of Dissolution was prepared incorporating a Separation and Property Settlement Agreement (hereinafter "Settlement Agreement"). However, this Settlement Agreement was never signed by the parties. There is nothing in the record to indicate when the court received the proposed Decree.

The proposed Decree of Dissolution, incorporating the Settlement Agreement, became final and was entered as the Decree of Dissolution on January 20, 1993. In its Decree, the court stated:

> The parties have acquired certain items of property and debt during the course of their marriage, and have entered into a Separation and Property Settlement Agreement that disposes of all the non-marital and marital property of the parties, apportions the marital debt, and sets forth provisions for custody, visitation and support of the parties' minor children. A copy of said Agreement has been provided to the Court. The Court has reviewed the parties' Agreement, and finds same to be not unconscionable, and in the best interests of the parties' minor children. Said agreement should therefore be approved, and incorporated into this Court's Decree of Dissolution.

Again, there was no written agreement signed by the parties as to the division of assets. There was, however, an oral agreement made on the record that was based on Exhibit 2.

Wife argues on appeal that the Settlement Agreement incorporated in the court's Decree differs from the agreement that Wife's counsel read into the record which was based on Exhibit 2. In her brief, appellant points out the following differences:

> 1. Schedule C of the Decree, which sets forth Wife's marital personal property and household goods, lists miscellaneous music books valued at $250 and records/tapes valued at $250. Wife claims that these items are non-marital in nature and that no value should have been assigned to the marital estate relating to these items. Wife claims that the only marital music books, records, or tapes are in Husband's possession and are set forth in Schedule D as his marital property. Wife's understanding of the agreement placed on the record is that the value to be attributed to the music books, records, and tapes in Husband's possession, listed on Schedule D, should be $400, not the $200 referenced on Schedule D of the Decree. [This court notes that Exhibit 2 shows a value of $200 for the music books, records, and tapes listed on Schedule D. Schedule D of Exhibit 2 also lists miscellaneous music books valued at $250 and records/tapes valued at $250, and indicates that these items are to go to Wife. Thus, in this regard, the Decree and Exhibit 2 are consistent.]

> 2. Schedule C of the Decree lists a Custom Banjo ECAbend with a value of $425. Schedule C also lists a Stewart–McDonald Banjo with a value of $550. Wife's understanding of the agreement placed on the record is that the two banjos listed in Schedule C are one in the same, and that the entry for the Stewart–McDonald Banjo and the value attributed to that banjo should have been removed from Schedule C. [This court notes that Schedule C of Exhibit 2 lists only the Custom Banjo ECAbend with a value of $425. However, Schedule D of Exhibit 2 indicates that the Stewart–McDonald Banjo, with a value of $550, is to go to Wife. Thus, the Decree and Exhibit 2 are consistent in this regard.]

> 3. Schedule C of the Decree provides that Wife was to receive a rocking chair. However, a rocking chair is also listed on Schedule B as Husband's non-marital property. Wife's understanding of the agreement placed on the record is that there is only one rocking chair owned by the parties and the agreement entered into the record (as identified in Exhibit 2) designates the rocker to go to Wife. [This court notes that on Schedule C of Exhibit 2 the rocking chair to which Wife refers is crossed out, and there is a notation next to the item indicating that the item is non-marital property. There are two listings of the rocking chair on Schedule B, one typewritten and one handwritten. Sched-

ule B lists Husband's non-marital personal property. There is no indication on Schedule B of Exhibit 2 that the rocking chair is to go to Wife.]

4. Schedule B of the Decree lists a wedding ring twice and lists a gold chain. Wife claims that the listing of the gold chain and the second designation of the wedding ring are duplicative entries. Wife claims that the gold chain is the same gold chain described with the Egyptian Pendant on Schedule D of the Decree. [This court notes that on Schedule B of the Decree, no value is assessed to either the second entry of the wedding ring or the gold chain. We further note that Schedule B of Exhibit 2 lists only one wedding ring and no gold chain. Schedule D of Exhibit 2 lists the gold chain with Egyptian Pendant.]

5. The P/M gold nugget ring listed in section B of Schedule B of the Decree is the same as the gold ring listed in section A of Schedule B. Thus, the entry for the P/M gold nugget ring is duplicative. [This court notes that Schedule B of Exhibit 2 lists the gold ring under section A and the P/M gold nugget ring under section B. Thus, in this regard, the Decree and Exhibit 2 are consistent.]

6. The PA system listed on Schedule D of the Decree is valued at $600. Wife's understanding was that the value of the PA system was $1,200. [This court notes that Schedule D of Exhibit 2 shows that Wife valued the PA system at $600 and Husband valued it at $1,200. The compromised value (which is handwritten) is $600. Thus, the Decree and Exhibit 2 are consistent in this regard.]

7. The Takamine Guitar, listed on Schedule D of the Decree, is valued at $650. Wife's understanding was that the value of the guitar was $800. [This court notes that Schedule D of Exhibit 2 shows that Wife valued the Takamine Guitar at $500 and Husband valued it at $800. The compromised value (which is handwritten) is $650. Thus, the Decree and Exhibit 2 are consistent in this regard.]

8. The Decree requires Husband to pay the sum of $5,228 to Wife as an equalization on the property division. Wife contends that the in-court stipulation of counsel provided for an equalization payment of $10,000. [This court notes that the in-court stipulation of a $10,000 equalization payment *included* $4,772 in retroactive child support. The equalization payment of $5,228 in the Decree did not include the $4,772 in retroactive child support, but this amount was awarded to Wife in a later section of the Decree that discussed child support. Thus, the Decree did award Wife a total of $10,000 (including the $4,772 in retroactive child support).]

9. The Decree divides Husband's interest in a retirement plan with TWA, commonly known as the TWA "Plan A" Retirement Plan. The Decree references a QDRO attached as Exhibit A to the Decree and incorporated by reference. At the hearing on October 28, 1992, Wife's counsel stated that the marital portion will be divided pursuant to a QDRO "which will be submitted to the Court, hopefully, with the decree." No QDRO was ever submitted to the court and there is no Exhibit A attached to the court's Decree. [This court notes that the record does not reflect that the parties reached a specific agreement as to how the marital portion of the TWA "Plan A" Retirement Plan would be divided. At the hearing, the parties merely agreed that the marital portion of the retirement plan would be divided pursuant to a separate agreement (a QDRO) that would be submitted to the court. However, the record does not show that a QDRO was ever submitted to the court. Wife is correct in pointing out that the Decree divides the marital portion of this retirement plan and references a QDRO attached as Exhibit A. In its Decree, the court stated, "The parties intend that [Wife] shall be entitled to a fifty percent (50%) interest in that portion of [Husband's] interest in the 'Plan A' Retirement Plan offered by virtue of his employment with [TWA], and which was earned during the course of the parties' marriage. It is contemplated that [Wife] receive direct assignment and distribution of that portion of said Plan in an amount equal to fifty percent (50%) of the marital interest of [Husband's] interest in and to said bene-

fits." No QDRO is attached to the Decree and there is nothing in the record that shows that the parties agreed to such a division.]

On February 4, 1993, Wife filed a Motion for New Trial, or, in the alternative, To Amend, Modify or Correct the Decree of Dissolution, alleging certain errors and mistakes in the court's Decree. An affidavit in support of the motion was filed along with the motion. Wife's motion was overruled on May 4, 1993. This appeal followed.

In her first point on appeal, Wife contends that the trial court erred because the property settlement agreement incorporated in the trial court's Decree is different from the property agreement reached by the parties.

Section 452.325.1, RSMo 1986, provides that the parties to a dissolution may enter into a written separation agreement containing provisions for maintenance, the disposition of any property owned by either of them, and the custody, support and visitation of their children.[2] This is "to promote the amicable settlement of disputes between the parties." Section 452.325.2 provides that in a dissolution of marriage proceeding, the terms of the separation agreement, except terms providing for the custody, support, and visitation of children, are binding upon the court unless the court finds that the separation agreement is unconscionable.

In *O'Neal v. O'Neal*, 673 S.W.2d 126, 127–28 (Mo.App.1984), the court stated:

A separation agreement is unique in that the trial court must review it and, considering the parties' economic circumstances and any other relevant factors, find it conscionable before it takes effect. § 452.-325.2. There are thus actually three parties who must approve of its terms before it may be enforced. In this respect a separation agreement under § 452.325.1 differs from a settlement agreement in a typical civil suit. The statute specifically asserts that the purpose of such agreements is "[t]o promote the amicable settlement of disputes between the parties to a marriage." § 452.325.1. *Given the stated purpose of separation agreements and the*

*fact that to some extent they are three-party agreements, we find that the legislature intended that the husband and wife jointly, while in agreement, come before the court and present their proposed settlement for the court's approval.* Either one or both of the parties may offer the existing agreement when presented (emphasis added).

In *O'Neal*, the court reversed both the order enforcing the settlement agreement and the incorporation of the agreement into the decree because, at the time the agreement was first presented to the trial court, the parties were in dispute over its terms. *Id.* at 128. In the case at bar, by contrast, the parties came before the court and presented their proposed settlement orally and by reference to Exhibit 2. The record is clear that the parties were not in dispute as to the terms of the agreement, with respect to property division, when Wife's counsel presented it to the court on October 28, 1992.

Given that the parties were in agreement when the separation agreement was orally presented to the court, the first issue that arises is whether the separation agreement must actually be in writing to be approved by the court, or whether it can be oral. In *Peirick v. Peirick*, 641 S.W.2d 195, 196 (Mo. App.1982), the husband argued that the trial court improperly approved the orally-stipulated property settlement agreement because it was not a "written separation agreement" provided for in section 452.325.1. The *Peirick* court stated that the answer to this argument was found in *Hansen v. Ryan*, 186 S.W.2d 595, 600 (Mo.1945), where the court stated:

In the administration of justice and the prompt dispatch of business, courts must and do act upon the statements of counsel and upon the stipulations of parties to pending causes. Where the parties have voluntarily entered into a stipulation, which appears fair and reasonable for the compromise and settlement of the issues of a pending cause, *and where the stipulation is spread upon the record with the consent and approval of the court,* as here, the parties are bound thereby and the court

2. All statutory references are to RSMo 1986, unless otherwise noted.

may, thereafter, properly proceed to dispose of the case upon the basis of the pleadings, the stipulation and admitted facts.

*Peirick,* 641 S.W.2d at 196 (quoting *Hansen v. Ryan,* 186 S.W.2d 595, 600 (Mo.1945)) (emphasis added). The *Peirick* court stated that nothing in section 452.325 repudiates the rule announced in *Hansen. Id.* The mere fact that the parties to a dissolution of marriage action may dispose of their property through a written separation agreement does not imply that a written separation agreement is the only way the parties may dispose of their property. *Id.*

The court found that "an oral stipulation should be as binding as a written contract when the oral agreement is entered into in open court by parties represented by able counsel and the agreement is spread upon the record." *Id.* (quoting *Markwardt v. Markwardt,* 617 S.W.2d 461, 462 (Mo.App. 1981)). In *Peirick,* it was clear that the parties entered into a binding stipulation in open court concerning the division of their property, and both parties were represented by counsel. *Id.* The terms of the stipulation agreement were not at issue in the appeal. *Id.* The court held that it was not error for the trial court to order a disposition of the parties' property on their oral, in-court stipulation rather than on an earlier written separation agreement. *Id.*

There is a line of cases in the Western District which seem to hold that section 452.-325 requires that the separation agreement be in writing. *See Potter v. Potter,* 621 S.W.2d 123 (Mo.App.1981); *Wilhoit v. Wilhoit,* 599 S.W.2d 74 (Mo.App.1980); *Turpin v. Turpin,* 570 S.W.2d 831 (Mo.App.1978). These cases, however, are distinguishable.

In *Potter v. Potter,* 621 S.W.2d 123 (Mo. App.1981), this court held that the trial court erred in approving an oral stipulation read into the record concerning the division of marital property, because the division was required to be in writing under section 452.-325. The *Potter* court relied on *Turpin v. Turpin,* 570 S.W.2d 831 (Mo.App.1978), and *Wilhoit v. Wilhoit,* 599 S.W.2d 74 (Mo.App. 1980), in reaching its decision. The *Potter* court stated, "[t]he *Turpin* and *Wilhoit* cases

settle the matter that if the parties agree upon a distribution of marital property, the agreement *must* be in writing." *Potter,* 621 S.W.2d at 125 (emphasis in original). *Wilhoit* and *Turpin,* however, are distinguishable from the case at bar.

In *Wilhoit v. Wilhoit,* 599 S.W.2d 74, 77 (Mo.App.1980), the court stated that the language of section 452.325 providing that spouses, attendant to separation or dissolution, "may enter into a written separation agreement" was given effect in *Turpin* to impose the condition of written agreement to the operation of that section. The *Turpin* court found the terms of the statute to be plain and unambiguous that the separation agreement must be in writing, and found there to be no need for judicial interpretation. *Turpin,* 570 S.W.2d at 835. The *Wilhoit* court, relying on *Turpin,* found that if spouses choose to settle their property rights between them by agreement rather than by judicial division, the expression of that assent must be written. *Wilhoit,* 599 S.W.2d at 77. "The rationale is to avoid dispute and manifests once again a transcendent purpose of the Dissolution of Marriage Act to avoid litigation beyond the dissolution proceeding, itself." *Id.* (citations omitted).

*Wilhoit* is distinguishable from the case at bar. In *Wilhoit,* the trial court had ordered dissolution on the joint petition of the spouses, made award of custody and maintenance, but no disposition of the marital property. *Id.* at 76. The wife brought her Motion to Set Aside Decree on the ground that the failure to divide the marital property rendered the judgment only interlocutory and invoked jurisdiction to complete the adjudication. *Id.* at 76. On the evidence, the court sustained the wife's motion and, by separate hearing, made division of the marital property and entered final judgment. *Id.* at 76. On appeal, the husband contended that there was a property division agreement between him and his wife that was not unconscionable. *Id.* at 76. The court determined that the original decree failed to adjudicate the property rights between the spouses, either by judicial division or by a separation agreement, and so remained amenable to a completed judgment. *Id.* at 76. Thus, in *Wil-*

*hoit,* the existence of a separation agreement between the spouses was in dispute. In the case at bar, the record is clear that the parties reached an agreement as to the division of property which was presented to the court at the hearing on October 28, 1992. Furthermore, in *Wilhoit,* the court found the original judgment to be deficient as a final determination of the marital property not only because of a lack of writing, but because the full marital property was not before the court, consideration was not given to the full circumstances of the spouses, and the agreement of disposition was not given sanction by the court as nonunconscionable. *Id.* at 77–78.

The court in *Markwardt v. Markwardt,* 617 S.W.2d 461, 462 (Mo.App.1981), distinguished the *Turpin* case and found that, in *Turpin,* the apparent basis for the court's ruling was that the court was "unable to determine from the scanty record whether a separation agreement had in fact been reached." The *Turpin* court noted that neither the appellant nor his counsel was asked whether they consented to the agreement. *Turpin,* 570 S.W.2d at 835. In *Markwardt,* by contrast, it was clear that the parties entered into a binding stipulation in open court concerning the division of their property. *Markwardt,* 617 S.W.2d at 462. The court in *Markwardt* stated, "[l]ike the Supreme Court of Missouri this court believes that an oral stipulation should be as binding as a written contract when the oral agreement is entered into in open court by parties represented by able counsel and the agreement is spread upon the record." *Id.* (citing *Fair Mercantile Co. v. Union–May–Stern Co.,* 359 Mo. 385, 221 S.W.2d 751, 755 (1949)).

In both *Markwardt* and *Peirick,* the parties to the dissolution action appeared in court with their respective lawyers and agreed on the record to a complete and specific disposition of their property. The trial court in both cases found the testimonial settlement consciable.

■ We find, in accordance with the *Markwardt–Peirick* line of cases, that oral agreements as to property division are binding when entered into in open court by parties represented by counsel and the agreement is "spread upon the record."

Having found that a property settlement agreement does not have to be in writing under section 452.325, we next address the issue of how specific or definite the terms of the oral agreement must be in order to be considered "spread upon the record." Wife argues that, in the case at bar, the terms of the agreement were not "spread upon the record" and that, although counsel made reference to Exhibit 2 in reciting the parties' agreement as to property division, the agreement on the record was vague and incomplete. Wife contends that the brief statements of counsel and the reference on the record to Exhibit 2 do not constitute an agreement that was "spread upon the record" as required by *Peirick.*

"Sketchy, imprecise agreements to divide property in a dissolution proceeding may become a source of great difficulty for the parties ..., but error without prejudicial effect upon the appealing party's rights is not grounds for reversal." *In re Marriage of Herndon,* 756 S.W.2d 656, 659 (Mo.App.1988) (citations omitted).

Courts have recognized the necessity that separation agreements between spouses be specific so that the need for recourse to further litigation is minimized and for other practical reasons. *See, e.g., Markwardt,* 617 S.W.2d at 463; *Turpin,* 570 S.W.2d at 835.

■ We acknowledge that the agreement entered into the record by Wife's counsel did not specify all the assets and their values. However, the agreement was based on Exhibit 2 which did set out the specific assets, their values, and which spouse was to receive the particular asset. While Exhibit 2 was somewhat confusing because of all the cross-outs and handwritten notations thereon, we find that the agreement as to property division was adequately "spread upon the record." Except as noted below, the trial judge, based on the record provided (orally and through Exhibit 2), was able to determine how the property was to be divided.

Having compared the agreement made on the record by reference to Exhibit 2 and the Settlement Agreement incorporated in the

court's Decree, we conclude that the only arguably material difference between the two is the court's division, in the Decree, of Husband's TWA "Plan A" Retirement Plan. Absent a specific agreement by the parties on the record, the court erred in dividing this retirement plan as part of the Settlement Agreement. Besides this difference, however, the Settlement Agreement incorporated in the trial court's Decree is the same agreement that the parties recited into the record at the hearing on October 28, 1992, through Exhibit 2. Moreover, the Settlement Agreement incorporated in the Decree is clearer and more definite than Exhibit 2 which is somewhat confusing due to the various cross-outs and handwritten changes marked thereon.

We find that the agreement made on the record was sufficiently precise, except as to the division of Husband's "Plan A" Retirement Plan which was of minimal value and in regard to which the parties recited on the record they intended to include as part of a separate agreement.[3] The trial court erred in dividing this retirement plan as part of the Settlement Agreement, absent a specific agreement of the parties on the record. Nonetheless, the agreement between the parties was otherwise a thorough and comprehensive agreement. The retirement plan was of minimal value and had no significant impact on the property division the parties otherwise agreed upon. We do not believe that the failure of the parties to complete their agreement in regard to the retirement plan prejudices the appellant such that the Settlement Agreement need be set aside. Accordingly, we remand for the trial court to determine independently the division of the marital portion of Husband's "Plan A" Retirement Plan. In all other respects, we find that the Settlement Agreement incorporated in the trial court's Decree was, in effect, the same agreement to which the parties agreed in open court on October 28, 1992.

In her second point on appeal, Wife argues that the trial court erred and abused its discretion in failing to award her decretal maintenance. She contends that (1) she met the statutory prerequisites for maintenance set forth in section 452.335; (2) evidence was presented that she was unable to support herself through appropriate employment due to a medical condition known as "fecal incontinence" and that she needed to be at home with her children as she had been for the preceding five years; and (3) the trial court failed to consider new evidence concerning the medical condition of fecal incontinence which was discovered after the hearing held on October 29, 1992.

This court must affirm the trial court's decision awarding maintenance unless no substantial evidence supports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Lefever v. Lefever*, 840 S.W.2d 873, 875 (Mo. App.1992) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). Further, we view the evidence as favorable to the decree, disregarding contrary evidence and deferring to the trial court even if the evidence could support a different conclusion. *Bixler v. Bixler*, 810 S.W.2d 95, 99 (Mo.App.1991).

Section 452.335.1, RSMo Supp.1993, provides that the court may grant a maintenance order to either spouse, but only if it finds that the spouse seeking maintenance: (1) lacks sufficient property, including marital property apportioned to her, to provide for her reasonable needs; and (2) is unable to support herself through appropriate employment. As for the amount and duration of the maintenance award, section 452.335.2, RSMo Supp.1993, sets out the relevant factors that the court must consider. These factors are only to be considered after the court finds that the threshold test in section 452.335.1, RSMo Supp.1993, is satisfied and allows an award of maintenance. *Wallace v. Wallace*, 839 S.W.2d 354, 357 (Mo.App.1992).

It is not always an abuse of discretion that a maintenance award falls short of the spouse's monthly expenses. *In re Marriage of Hall*, 801 S.W.2d 471, 472 (Mo.App. 1990). A divorcing spouse has an affirmative duty to seek full-time employment after dissolution. *Id.* Furthermore, the marital

---

**3.** Exhibit 2 shows that the marital portion of Husband's "Plan A" Retirement Plan had a dollar value of $2,614. This amount is insignificant relative to the value of the other assets.

property awarded bears upon the amount of maintenance to be awarded. *Bixler*, 810 S.W.2d at 100.

At the hearing on October 29, 1992, Wife testified that she was not presently employed, but had been employed in the past as a music teacher with the public school system in Leavenworth, Kansas. She worked as a music teacher for ten years up until 1987. Wife, who was 39 years old at the time of the hearing, testified that she has a Master's Degree in Music Education. In addition to her teaching career, she would also sing in bands with her husband on occasion, and she had experience in music retail.

Wife stated that she was unable to return to teaching after the birth of her second child in 1987 because she had a condition called fecal incontinence which was connected with her daughter's delivery. Furthermore, Wife stated that she and her husband had agreed that it would be best for the children if she did not return to work until both children were at least into kindergarten.

Wife testified that in order to correct her problem with fecal incontinence, she needed surgery which would have to be performed by a specialist. However, she further testified that it was possible that exercises recommended by her doctors could alleviate her problem. Apparently, Wife's doctor had informed the school district that Wife would not be able to return to work because of her condition. No doctors testified at the hearing about Wife's fecal incontinence and no medical records were provided. At the time of the hearing, Wife was living with her parents. She had not had surgery and she continued to experience problems with fecal incontinence. Wife, however, expressed the desire to return to work after taking care of her physical problem.

The record reflects that Husband earned approximately $2,400 per month at TWA, before taxes. Out of that amount, Husband had to pay $600 per month in child support. According to Wife's testimony, she has been living with her parents and her parents have paid for many of her expenses. As of the hearing date, Wife owed her parents approximately $50,000, which is set out in Schedule E of the Decree as "Debts Assumed By Petitioner." This amount included Wife's attorney's fees. Wife estimated her expenses at $1,450 per month for food, clothing, dental care, beauty shop, and prescription drugs; $590 per month for automobile expenses and insurance expenses; and $644 per month for rent, utilities, mortgage, and telephone.

Wife, however, received a significant amount of assets from the property division agreement, some of which are income producing assets. Wife received the following as separate non-marital property: household goods and personalty worth $5,285; a savings CD worth $14,517.19; 25% of KPERS Plan worth $1,075; non-marital portion of an equitable IRA certificate worth $2,744.66. As marital property, Wife received: household goods and personalty worth $8,349.50; approximately $15,000 in proceeds from the sale of the marital home; a 1984 Ford Bronco; various retirement accounts, IRAs, and CDs worth approximately $32,000; 33 U.S. Savings Bonds at $100 each; and an interest in that portion of Husband's "Plan A" Retirement Plan offered by virtue of his employment with TWA which was earned during the parties' marriage (the exact division to be determined on remand, as discussed above in Point I). Wife also received $5,228 as an equalization payment from Husband. The record reflects that in addition to IRAs, CDs, personal property, and the vehicle, Wife has total property worth approximately $45,489.

At the hearing, the following colloquy occurred:

Q [Wife's attorney]: Do you expect Mr. Carter to pay you every single dollar that's the difference between child support and your interest income and what your needs are?

A [Wife]: No. No.

Q: What are you asking that the Court require Mr. Carter to pay you as maintenance?

A: The insurance of approximately—the insurance of 195 and 250.

Q: And how do you arrive at that figure?

A: To meet the expenses that I now have and provide for medical—medical coverage.

\*     \*     \*     \*     \*     \*

Q: And are you asking that he pay this money in a perpetuity, or at what point in time do you believe that you would be in a position to make it on your own without assistance from him?

A: I hope to, fully hope to, be able to obtain employment once Lauren is in kindergarten next year, next fall. And, hopefully, with therapy, all will go well with the—continue to progress with the kids, and I will be able to do that.

    \*    \*    \*    \*    \*    \*

Q: So you are asking for maintenance and the support, or the payment of the premiums, for how long of a period of time, then?

A: Oh, until fall of—next fall.

Thus, Wife was requesting a total of $445 per month in maintenance for one year.

In its Dissolution Decree, the court ordered the following with respect to maintenance:

> The Court finds that the Petitioner has been unemployed since the birth of the parties' second child, and further has certain health conditions which she alleges require medical attention. The Court finds that both parties are able-bodied and able to work and support themselves. Therefore, except as set forth herein, no periodic maintenance should be awarded in this cause. However, taking into consideration all relevant factors, including those as set forth in R.S.Mo. Section 452.335, the Court finds that it would be appropriate that the Respondent pay the health insurance premium which may be necessary to continue coverage for the benefit of the Petitioner through the health insurance program provided by his employer, (or pursuant to COBRA) for a period of twelve months from and after the date of this Decree of Dissolution. The cost of any premium which the Respondent may be required to make with respect to this obligation shall be denominated as maintenance to be paid for the benefit of the Petitioner. Upon expiration of the twelve (12) month period, and payment of the premiums as referenced herein, Respondent's maintenance obligation shall terminate, and the Court's order shall be non-modifiable.

In her brief, Wife cites to *Wallace v. Wallace*, 839 S.W.2d 354, 357 (Mo.App.1992), for the proposition that the trial court may consider the effect the physical condition of the spouse requesting maintenance has on her capacity to work and earn a living in deciding whether to award maintenance. In *Wallace*, the court reversed the trial court's denial of maintenance. *Id.* at 359. *Wallace*, however, is distinguishable from the case at bar.

In *Wallace*, the trial court failed to award maintenance to the wife, who was 51 years of age. *Id.* at 355. In determining whether the trial court committed error, the appellate court considered the amount of property that the wife received which consisted of two old cars, various household goods, half of a pension fund amounting to $601, and half of the equity in the marital residence amounting to $4,016. *Id.* at 355. The wife was unemployed and her income consisted of approximately $250 per month from various sources. *Id.* at 356. She was not steadily employed outside the home during the marriage and there was *extensive evidence in the record* pertaining to her mental and physical health. *Id.* at 356. She suffered from high blood pressure and obesity, she had poor circulation which caused pain in her legs from sitting or standing for long periods, and she received social security disability benefits during the marriage for some of these conditions. *Id.* at 356.

The court in *Wallace* applied the two-prong threshold test set forth in section 452.335.1, RSMo Supp.1993, and found that the wife met the criteria for an award of maintenance. *Id.* at 357–58. In applying the first prong, the court found that the wife did not have sufficient property to meet her reasonable needs because she had no separate property and no income producing property. Her only assets consisted of property awarded to her in the dissolution proceedings which included two old cars, some household goods, and money awards of approximately $4,600. *Id.* at 357.

In applying the second prong, the *Wallace* court found that the wife was unable to meet her reasonable needs through appropriate

employment. *Id.* at 358. In arriving at this conclusion, the court considered the wife's detailed testimony at trial regarding her health problems which, in addition to high blood pressure, obesity, and circulation problems, consisted of depression, an umbilical hernia, blockage in arteries in her legs, and varicose veins. *Id.* at 357. The wife testified that she had a stroke caused by high blood pressure and that her umbilical hernia prevented her from lifting heavy objects. *Id.* at 357. The wife also presented evidence of mental health disorders. Furthermore, the wife's treating physician and psychiatrist testified that her physical and mental condition made her unable to work. *Id.* at 358. In addition, a vocational expert testified that the wife's age, education, job skills, physical limitations, and mental condition made her unemployable in today's economy. *Id.* at 358. The court found that there was no evidence to support a finding that the wife would be able to meet her reasonable needs through appropriate employment. *Id.* at 358.

■ Applying the two-prong test to the instant case, we find that, for the first prong, Wife received a significant amount of assets from the property division agreement, as set forth above. Moreover, some of this property was income producing property. Thus, Wife had sufficient property to meet her reasonable needs, except perhaps her immediate medical needs. In this regard, the trial court took Wife's medical condition into consideration when it ordered Husband to pay for Wife's health insurance premiums for the year. In its Decree, the trial court denominated this award as maintenance.

Applying the second prong, it is apparent that Wife was capable of meeting her needs through appropriate employment, and the trial court so found. Unlike *Wallace*, there was no testimony from doctors that Wife would be unable to work because of her medical condition. Wife is fairly young, has a Master's Degree in Music Education, and was employed continuously through 1987. As noted above, the trial court acknowledged her medical condition and took this into account when it ordered Husband to pay Wife's health insurance premiums for the year.

■ We next address Wife's contention that the trial court failed to consider new evidence concerning the medical condition of fecal incontinence which was discovered after the hearing held on October 29, 1992. In Wife's Motion for New Trial, filed on February 4, 1993, Wife stated that she "has recently become aware of new evidence concerning the medical condition of fecal incontinence. . . . [Wife] is now aware that the only likely resource for obtaining corrective surgery is at the Mayo, or what she understands to be the Oschner Clinic. Each of these hospitals are located out of the State of Missouri, and [Wife] will incur a substantial expense in traveling to them to obtain the necessary surgery." Wife asked the court to amend its Decree to make provisions for assistance in satisfying travel and lodging expenses to obtain the surgery.

The trial court did not err in failing to consider Wife's "new evidence." Wife had known about her condition since 1987 and could easily have obtained this information before the hearing in October of 1992. After Wife had been consulting with doctors for five years about her condition, we are hard-pressed to find that she did not have this information available to her at the time of the hearing.

We find no abuse of discretion in the trial court's maintenance award.

We remand this case for the trial court to divide the marital portion of Husband's "Plan A" Retirement Plan. In all other respects, the judgment is affirmed.

All concur.